IN RE the MARRIAGE OF:

Linda K. EVENSON, Joint-Petitioner-Respondent,

v.

Christopher H. EVENSON, Joint-Petitioner-Appellant.

Court of Appeals

*No. 98–0803. Submitted on briefs January 20, 1999.—Decided June 9, 1999.*

(Also reported in 598 N.W.2d 232.)

On behalf of the joint-petitioner-appellant, the cause was submitted on the briefs of *Christopher H. Evenson*, pro se.

On behalf of the joint-petitioner-respondent, the cause was submitted on the brief of *Howard T. Healy* and *Jesse R. Ostrom* of *Di Renzo and Bomier* of Neenah.

Before Snyder, P.J., Nettesheim and Anderson, JJ.

SNYDER, P.J.   Christopher H. Evenson appeals from a divorce judgment determining the property allocation and child support obligations of himself and Linda K. Evenson. Christopher disputes whether the parties' Limited Marital Property Agreement (LMPA), executed after filing for divorce, should have been incorporated in the divorce judgment without an inde-

pendent review by the trial court. Pursuant to *Ray v. Ray*, 57 Wis. 2d 77, 203 N.W.2d 724 (1973), and *Norman v. Norman*, 117 Wis. 2d 80, 342 N.W.2d 780 (Ct. App. 1983), we conclude that the parties' LMPA was a divorce stipulation subject to repudiation. We therefore reverse and remand this portion of the judgment.

Christopher also contends that the court improperly strayed from the Department of Health and Social Services' (DHSS) child support guidelines in calculating his child support obligation. Because we conclude that the court did not improperly exercise its discretion in determining Christopher's child support, we affirm on this issue.

## Background

Christopher and Linda were married in 1978. Christopher has been employed as an attorney in private practice and Linda as a bank president. Christopher and Linda are the parents of two daughters. On April 22, 1996, the parties commenced this divorce proceeding.

Prior to the divorce action, the parties resided at 310 Willow Lane in Menasha, Wisconsin. Shortly after filing for divorce, Christopher sought to purchase his own residence in Menasha. In an effort to facilitate Christopher's purchase, the parties executed an LMPA on May 15, 1996, under the caption and case number of their pending divorce action. The LMPA addressed each party's rights as to the 310 Willow Lane property, Christopher's new residence at 815 First Street, the value of their retirement, bank and money market accounts, and the value of Linda's Norwest Bank

stock.[1] After executing the LMPA, Christopher purchased the 815 First Street property and Linda remained at 310 Willow Lane.

In the fall of 1996, the parties had not reached a final divorce agreement. As a consequence, in an October 21, 1996 letter, Christopher informed Linda that he "may be seeking relief from portions of the [LMPA]." He claimed that the agreement was inequitable as to the valuation of Linda's Norwest stock holdings.

In May 1997, the parties reached a final mediation agreement as to the placement of the children. On August 28 and September 3, 1997, a trial was held before the court to resolve issues of placement and valuation of marital property. In its September 3, 1997 findings, the court determined that although Christopher did not have "complete and full financial disclosure" of all of Linda's assets, the LMPA was not "unfair" and therefore would be enforceable on its terms.

In its written judgment dated February 2, 1998, the court granted the parties joint legal custody of their children with primary placement at Linda's residence consistent with the parties' May 1997 mediation agreement. The court decided that neither party would be awarded maintenance. It also determined Christo-

---

[1] Paragraph five of the LMPA addressed the parties' retirement accounts and Linda's stock holdings:

5. The parties further agree that all retirement accounts and the Norwest Stock account of Linda K. Evenson shall be valued as of 3/31/96 for the purpose of property division valuation. Any increase in value of the retirement plans of both parties and/or the Norwest Stock account of Linda K. Evenson based upon contributions or appreciation made or earned after 3/31/96 shall be the separate property of each party, shall be property not subject to property division, and shall not be factored into the calculation of any equalization payment that may be due to either party.

pher's level of child support. In dividing the property, the court ordered an equal division of all the assets valued as of the date of trial, except for the assets specifically included in the parties' LMPA. The court ultimately enforced the LMPA. Among the LMPA assets were Linda's Norwest stock account, which was to be valued as of March 31, 1996. Christopher appeals.

## Discussion

### A. *Property Division*

Christopher alleges that between the date of the LMPA and the trial, the value of Linda's Norwest stocks increased from $44,525 to $88,443. Christopher claims that he was entitled to one-half of this increase because he had repudiated the portion of the LMPA addressing Linda's stock holdings due to her failure to fully disclose her stock holdings on the date of the parties' LMPA. Christopher contends that the trial court erred in concluding that the parties' LMPA was entitled to a presumption of enforceability. He argues that because the LMPA was created in anticipation of divorce, § 767.10(1), STATS., should apply. Section 767.10(1) provides:

> The parties in an action for an annulment, divorce or legal separation may, subject to the approval of the court, stipulate for a division of property, for maintenance payments, for the support of children, for periodic family support payments under s. 767.261 or for legal custody and physical placement, in case a divorce or legal separation is granted or a marriage annulled.

According to Christopher, the LMPA was a divorce stipulation and not a written agreement under

§ 767.255(3)(L), STATS. Citing *Ray v. Ray*, 57 Wis. 2d 77, 203 N.W.2d 724 (1973), he asserts that until the court approves the stipulation, it is simply a recommendation to the court and either party is free to repudiate the agreement until it is made part of the divorce judgment.

Linda replies that the trial court properly determined that the LMPA was a marital property agreement under § 767.255(3)(L), STATS., and not a "property stipulation" pursuant to § 767.10, STATS. Section 767.255(3)(L) provides that among the factors a court shall consider when dividing property in a divorce is the following:

> (L)  Any written agreement made by the parties before or during the marriage concerning any arrangement for property distribution; such agreements shall be binding upon the court except that no such agreement shall be binding where the terms of the agreement are inequitable as to either party. The court shall presume any such agreement to be equitable as to both parties.

Linda claims that the LMPA was entered into with the intention that it be a binding agreement not subject to divorce negotiations. She suggests that the fact that the document was entitled "Limited Marital Property Agreement" reveals the parties' intention that it be a binding agreement. She further asserts that *Ray* is no longer applicable in the wake of the supreme court's more recent decision in *Button v. Button*, 131 Wis. 2d 84, 388 N.W.2d 546 (1986).

██

At issue here is whether the document presented to the court was a binding agreement pursuant to § 767.255(3)(L), STATS., or a divorce stipulation pursuant to § 767.10(1), STATS. This presents a question of

statutory interpretation which is a question of law decided independently of the trial court. *See State v. Gavigan*, 122 Wis. 2d 389, 391, 362 N.W.2d 162, 164 ( Ct. App. 1984).

Because the parties dispute whether *Ray* or *Button* controls, we address each case in turn. In *Ray*, the parties had been married eighteen years when the plaintiff filed for divorce. *See Ray*, 57 Wis. 2d at 78, 80, 203 N.W.2d at 724–25. Two months before filing for divorce, the plaintiff, stating that she just wanted to "get out" of the marriage, signed a document entitled "Agreement" which granted her $500 plus $2000 from the proceeds of property jointly owned by the parties. *See id.* at 79, 203 N.W.2d at 725. The document stated that each party was completely informed of the financial and personal status of the other and then listed the property owned by each of the parties, jointly and individually. *See id.* at 79–80, 203 N.W.2d at 725.

When the plaintiff filed for divorce, the defendant requested that the court incorporate in the subsequent divorce judgment the property division set forth in the agreement. *See id.* at 80, 203 N.W.2d at 725. The trial court found that the agreement was valid and that the parties had entered into it willingly, knowingly and voluntarily. *See id.* The court adopted the entire agreement, except for the provisions relating to child support, and found that, absent fraud, it was unnecessary to consider whether the plaintiff was adequately provided for under the agreement. *See id.*

In its decision, the supreme court recognized two types of postnuptial agreements: (1) "family settlements, which contemplate a continuation of the marriage relation," and (2) "separation agreements . . . which are made after separation or in contemplation of a separation in the immediate future." *Id.* at 82, 203

N.W.2d at 726. Divorce actions involving a family settlement are reviewed only to determine whether the agreement was subject to fraud. *See id.*

Separation agreements or divorce stipulations, on the other hand, involve "[r]adically different consequences and considerations" because the agreement is entered into "at or immediately prior to separation" and "attempts to limit rights and liabilities between the parties after a divorce." *Id.* The court pointed out that the "legislature has embodied the very essence of the distinction between these two types of postnuptial contracts in sec. 247.10, STATS., 1969," which is the predecessor to § 767.10(1), STATS., and corresponds to the separation agreement.[2] *Ray*, 57 Wis. 2d at 83, 203 N.W.2d at 726. The separation agreement requires court approval in order to uphold the "active third-party interests" which the state has in divorce cases. *Id.* at 84, 203 N.W.2d at 727. The court cited *Miner v. Miner*, 10 Wis. 2d 438, 443, 103 N.W.2d 4, 7 (1960), which determined:

> The court has the same serious duty to examine carefully such agreements or stipulations against the background of full information of the economic status and resources of the parties as it has in making a determination without the aid of such an agreement. . . . There is no such thing in this state as a divorce by consent or agreement. The parties cannot by stipulation proscribe, modify, or oust the court of its power to determine the disposition of property, alimony, support, custody, or other matters involved in a divorce proceeding. When a court

---

[2] Section 247.10, STATS., 1969, provided that "the parties may, subject to the approval of the court, stipulate for a division of estate, for alimony, or for the support of children, in case a divorce or legal separation is granted or a marriage annulled."

> follows and adopts an agreement of the parties making it a part of its judgment, *the court does so on its own responsibility, and the provisions become its own judgment.*

*Ray*, 57 Wis. 2d at 84, 203 N.W.2d at 727.[3] The court then remanded the case for an independent determination as to the adequacy of the parties' agreement. *See id.* at 84–85, 203 N.W.2d at 727.

In *Button*, both parties had been previously married and entered into their second marriage later in life. *See Button*, 131 Wis. 2d at 90, 388 N.W.2d at 548. When the parties were married in 1969, Mrs. Button had accumulated personal property and assets worth $15,000. *See id.* Five years later, Mr. Button sold his business for $85,000 and the parties then signed a postnuptial agreement which provided that in the event of divorce all property owned prior to the marriage or acquired after the marriage would remain the separate property of each party. *See id.* at 92–93, 388 N.W.2d at 549.

Some nine years after entering into the postnuptial agreement, the parties initiated divorce proceedings. Mrs. Button claimed that at the time the postnuptial agreement was made, the terms were never explained to her and that no financial disclosure had been made. *See id.* at 92, 388 N.W.2d at 549. When the divorce was finalized, Mrs. Button was awarded $7882.10 and Mr. Button received $255,103.99. *See id.* at 88, 388 N.W.2d at 547. Mrs. Button appealed the

---

[3] As noted in *Abitz v. Abitz*, 155 Wis. 2d 161, 177, 455 N.W.2d 609, 616 (1990) (quoted source omitted), the policy supporting the court's active role in reviewing divorce stipulations is that the family court "represents the interests of society in promoting the stability and best interests of the family."

trial court's decision adopting the parties' postnuptial property division agreement.

In determining whether the parties' postnuptial agreement was equitable, the supreme court applied § 767.255(11), STATS., 1983–84 (now § 767.255(3)(L), STATS.). The court then articulated procedural and substantive requirements for an equitable agreement under § 767.255(11). *See Button*, 131 Wis. 2d at 99, 388 N.W.2d at 552.

Although both Christopher and Linda address whether the LMPA was equitable under the *Button* requirements, we need not answer this question. Instead, we conclude that this case is controlled by *Ray*. Contrary to Linda's suggestion, *Button* does not render *Ray* inapplicable. Rather, *Button* only applies to agreements made before or during marriage "which contemplate a continuation of the marriage relation." *Ray*, 57 Wis. 2d at 82, 203 N.W.2d at 726. As the *Button* court noted:

> The legislature has recognized that prenuptial and postnuptial agreements dividing property serve a useful function. They allow parties to structure their financial affairs to suit their needs and values and to achieve certainty. *This certainty may encourage marriage and may be conducive to marital tranquility by protecting the financial expectations of the parties.*

*Button*, 131 Wis. 2d at 94, 388 N.W.2d at 550 (emphasis added). In *Button*, the postnuptial agreement was intended to keep the parties' assets separate following Mr. Button's sale of his business. Because the divorce did not occur until 1983, the postnuptial agreement was clearly envisioned as a "family settlement," not a "separation agreement." *Ray*, 57 Wis. 2d at 82, 203 N.W.2d at 726.

██

In the present case, the agreement was executed *after* the parties filed for divorce. The caption on the instrument, although entitled "Limited Marital Property Agreement," included the case number from the parties' divorce action. In *Ray*, the parties entered into a property division agreement two months before the divorce proceedings. The plaintiff in *Ray* testified that she entered into the agreement because she wanted out of the marriage. Similarly, Christopher testified that he entered into the LMPA in order to facilitate the purchase of his own residence in anticipation of divorce. Like the agreement in *Ray*, Christopher and Linda's LMPA was a divorce stipulation, which was "made after separation or in contemplation of a separation in the immediate future." *Id.* We conclude that the parties' LMPA is governed by *Ray* and § 767.10(1), STATS.

As a divorce stipulation, the parties' LMPA was merely a "recommendation jointly made by [the parties] to the court suggesting what the judgment, if granted, is to provide." *Norman v. Norman*, 117 Wis. 2d 80, 81, 342 N.W.2d 780, 781 (Ct. App. 1983) (quoted source omitted). The stipulation amounted to "no more than an understanding of what the parties desire and recommend to the court" and did not "rise to the dignity of a contract." *Id.* (quoting *Miner*, 10 Wis. 2d at 444, 103 N.W.2d at 8). Additionally, the stipulation did not bind the parties and they were free to withdraw from the stipulation until it was incorporated into the judgment. *See Norman*, 117 Wis. 2d at 82, 342 N.W.2d at 781.

Because the parties' LMPA was a divorce stipulation, Christopher was free to repudiate all or part of it. Our review of the record indicates that prior to the court's divorce judgment, Christopher sought to with-

draw from the portion of the LMPA concerning the division of Linda's Norwest stock account and her retirement accounts. Consistent with *Ray* and *Norman*, we remand this case to the trial court for a contested hearing on this issue.[4]

### B.  Child Support

Next, Christopher challenges the trial court's method of calculating his child support obligation. He contends that although the trial court was not required to apply the percentage guidelines provided in WIS. ADM. CODE ch. HSS 80, once it did, it was strictly bound by those guidelines. He complains that the court inappropriately exercised its discretion by increasing his percentage of overnight placement without first determining the additional number of overnight equivalents. We disagree.

Determining the proper child support obligation of a party is committed to the sound discretion of the circuit court. *See Luciani v. Montemurro-Luciani,* 199 Wis. 2d 280, 294, 544 N.W.2d 561, 566 (1996). Deciding whether the trial court appropriately exercised its discretion is a question of law. *See id.* We must sustain a discretionary act if we find that the trial court "(1) examined the relevant facts, (2) applied a proper standard of law, and (3) using a demonstrated rational process, reached a conclusion that a reasonable judge could reach." *Id.* (quoted source omitted).

The trial court is required to calculate the appropriate award of child support by using the DHSS

---

[4] Christopher suggests that this court should simply award him "an additional $44,089 in balancing payment to equalize the division of the marital estate." We decline Christopher's request because we leave this determination for the trial court.

percentage standards unless a party requests a deviation and the court finds that the percentage standards are unfair to the child or any party. *See* § 767.25(1j), (1m), STATS. When a party challenges the application of the percentage standards, the trial court shall exercise its discretion by considering the statutory factors set forth in § 767.25(1m)[5] and by articulating the basis for its decision to either remain within the guidelines or allow a modification. *See Luciani*, 199 Wis. 2d at 295, 544 N.W.2d at 567. Whether or not the trial court uses the child support formula, it must make its child support determination based on an accurate understanding of the law. *See Prosser v. Cook*, 185 Wis. 2d 745, 751, 519 N.W.2d 649, 651 (Ct. App. 1994); *Molstad v. Molstad*, 193 Wis. 2d 602, 607, 535 N.W.2d 63, 65 (Ct. App. 1995) ("[I]f the trial court decides to apply the mathematical formulas contained in the child support standards, it must apply the formula correctly.").

The WIS. ADM. CODE ch. HSS 80 formulas for arriving at the appropriate percentage standard are based on the number of overnights a child spends with a parent. The formulas recognize that there may be care "equivalent" to overnight care ("overnight equivalents"), such as when the "payer provides day care while the payee is working." *See* WIS. ADM. CODE § HSS 80.02(25) and accompanying note ("Upon request of one of the parties the court may determine that the physical placement arrangement other than overnight care is the equivalent of overnight care."). Here, the trial court determined that Christopher would spend approximately 130 overnights with his children based upon the parties' placement schedule. As such, he is a "shared-time payer" under § HSS

---

[5] These factors include any concerns that the court determines are relevant. *See* § 767.25(1m)(i), STATS.

80.02(25) because he exceeds the "threshold" level of care by providing care for the children for more than 109.5 days in a year.[6] *See* § HSS 80.02(28).

WISCONSIN ADM. CODE § HSS 80.04(2) establishes the method for calculating a shared-time payer's child support obligation. Based upon Christopher's 130 overnights, we look to subdivision (2)(b), which states that a court shall: (1) determine the payer's child support obligation (either as a percentage or a fixed sum) under § HSS 80.03(1); (2) divide by 365 the number of overnights the payer has physical placement of the children to determine the percentage of the year the payer provides overnight care; (3) using this percentage of overnight physical placement, determine how much the child support obligation under (1) will be reduced in accordance with Table 80.04(2)(b); and (4) multiply the corresponding percentage from Column B of Table 80.04(2)(b) by the original child support figure under (1) to determine the payer's final child support obligation (either as a percentage or a fixed sum).

With this background, we now consider the trial court's findings. We first note that the court adopted the parties' May 1997 mediation agreement. Under this agreement, Linda was granted placement of the children on Monday night after 8:00 p.m., Tuesday and Thursday, and alternating weekends from Friday afternoon to Monday morning. Christopher was given

[6] We also presume that Christopher has "assume[d] all variable child care costs in proportion to the number of days he . . . cares for the child[ren] under the shared-time arrangement." WIS. ADM. CODE § HSS 80.02(25). Although Linda challenged whether Christopher was a "shared-time payer" at the reconsideration hearing, the court rejected her contention and Linda does not raise the issue on appeal.

placement on Monday after work until 8:00 p.m., Wednesday and alternating weekends.

In calculating Christopher's child support obligation, the court determined that the WIS. ADM. CODE ch. HSS 80 guidelines were "appropriate." The court then made the following finding:

> [W]hen I factor in travel time, travel days as well as ... four hours, maybe sometimes even five hours on those Mondays I am going to say that Mr. Evenson has the children for 39 percent of the time instead of 38 as proposed by Mr. Healy. . . . So that ups the percentage when looking at 25 percent primary care giver, primary placement to 70.03 percent of the original court obligation. So I am going to order child support in the amount of 17.5 percent as far as child support goes.

At the reconsideration hearing, the trial court explained its child support determination. The court first noted that with 130 overnights the children spent 35.6% of their placement time with Christopher. The court then increased this percentage because of Christopher's Monday evenings with the children and the additional time the children would likely be placed at Christopher's due to Linda's travel schedule. As the court stated:

> What the court did by [raising the] ... 35 and a half percent up to 39 percent was to try and schedule an amount of about that percentage in giving Mr. Evenson credit for the amount of quality time he was spending on Monday nights and also what appeared to be in the court's mind perhaps unequal amount of travel for Miss Evenson for Mr. Evenson. So I wasn't intending to say specifically final, she has 10 days more per year or 12 days more per year.

If I did that—it looks like I did—I was in error and I am going to correct that at this time; it was not a set figure of 10 or 12 days; if it was, that was the absolute maximum and the court was considering that to be net.

Thus, the court wanted to account for Christopher's additional time with his children without having to commit to a fixed numerical increase in overnight equivalents per year.

We now review the court's calculations. First, under WIS. ADM. CODE § HSS 80.03(1), the court found Christopher's initial obligation to be 25%. The court then calculated the percentage of the year in which Christopher had physical placement of the children, which was 130 of 365 days, or 35.6%. The court then adjusted this percentage from 35.6% to 39% based on the children's Monday evening placement with Christopher and Linda's additional travel time. Next, the court used the figure of 39% to determine the percentage of reduction under Table 80.04(2)(b), which was 70.03%. The court then calculated the child support obligation, multiplying 70.03% by 25%, which yielded 17.5%.

Christopher contends that the court's decision to increase his percentage of physical placement from 35.6% to 39% was in error because it did not follow the child support standards promulgated by DHSS. We disagree.

As recognized in *Luciani*, the trial court is permitted to use its discretion in modifying the percentage standard calculations when it determines that strict compliance would be unfair. *See Luciani*, 199 Wis. 2d at 295, 544 N.W.2d at 567. Here, Christopher requested that the court deviate from the 35.6% physical placement percentage because of his anticipated

additional care of the children. The court agreed and concluded that 39% was more appropriate than 35.6%. The court articulated the basis for deciding to modify the percentages, *see id.*, stating that a fixed number of additional overnight equivalents, as Christopher requested, would not be consistent with the parties' unpredictable travel schedules. The court noted that

> in my estimation travel placement and Monday night equivalence is not computed with a time clock. The court was not intending to put essentially a taxi meter inside the car and say if you are within three feet of your daughter, you get credit per minute for your daughter and likewise with respect to travel placement . . . .

The court concluded that if the final percentage were based strictly on a fixed number of additional overnight equivalents, the parties would attempt to account for each and every hour of placement time, which, the court determined, would not be in either party's best interest.

■ We are satisfied that the court properly exercised its discretion in reaching the 39% physical placement percentage. Contrary to Christopher's argument, the trial court was not required to utilize a fixed number of overnight equivalents because such a determination would not have been beneficial to the parties. We note, however, that at the reconsideration hearing, the court did in fact contemplate between ten and twelve overnight equivalents. This would have yielded an increase of between 2.7% and 3.2%, which would have accounted for the increase to 39%.[7] Regardless, we con-

---

[7] At the reconsideration hearing, the court also contemplated 15 additional overnight equivalents:

clude that the court was not required to rely strictly upon a fixed number of overnight equivalents in making its discretionary modification of the child support award.

## Conclusion

We reverse the trial court's judgment as to the property division and remand with directions that the trial court address the merits of Christopher's repudiation of the parties' § 767.10(1), STATS., property division stipulation. However, because a § 767.10(1) stipulation is subject to the approval of the court, the remand is not limited by Christopher's appellate issues. *See Bliwas v. Bliwas*, 47 Wis. 2d 635, 639, 178 N.W.2d 35, 37 (1970) ("[A] family court is not bound to accept, nor even to accept or reject in its entirety, a stipulation presented by the parties to a divorce action."). In addressing the property division, the trial court is free to consider any

[I]n setting that percentage up from 35.61 percent which I find Mr. Healy's calculation—I guess [I] just did a little math on my calculator here—to be the correct amount for scheduling overnights and [I] just increas[ed] that additional percentage to arrive at 39.9 as Mr. Healy said if you are looking in that range it would essentially give him credit for a maximum of 15 days; 15 and a half days additional period which wasn't keeping with the range that I felt was appropriate looking at the travel time and looking at the kinds of things going on Monday nights . . . .

Although the court initially appeared to have embraced 15 overnight equivalents, the transcript indicates that the court then considered "15 and a half days" to be inappropriate.

Our calculations reveal that a 4.3% increase from 35.6% to 39.9% would, in fact, be based upon 15 and one-half (15.695) overnight equivalents. However, because we hold that the trial court was not required to rely upon a fixed number of overnight equivalents, we conclude that the court did not improperly exercise its discretion.

factors it deems relevant. We affirm the court's child support award but note that because child support can be affected by the property division ruling, the court is free to revisit the child support issues as it sees fit.

Costs are denied to both parties.

*By the Court.*—Judgment affirmed in part; reversed in part and cause remanded with directions.